Submitted on the record and brief November 22, 1996; resubmitted March 7, accused disbarred March 27, reconsideration denied May 20, 1997

In re Complaint as to the Conduct of

# DAVID J. HASSENSTAB,
*Accused.*

(OSB 94-37, 95-25; SC S43513)

934 P2d 1110

Jeffrey D. Sapiro, Disciplinary Counsel, Lake Oswego, filed a brief for the Oregon State Bar.

No appearance *contra*.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Graber, Durham, and Kulongoski, Justices.*

PER CURIAM

* Fadeley, J., did not participate in the decision of this case.

## PER CURIAM

In this lawyer disciplinary proceeding, a trial panel of the Disciplinary Board found the accused guilty of two violations of *former* Disciplinary Rule (DR) 5-101(A) (1995)[1] (nondisclosure of a conflict of interest based upon the lawyer's own personal interests) and one violation of DR 1-102-(A)(2) (committing a criminal act that reflects adversely upon the lawyer's fitness to practice) and disbarred him. Upon *de novo* review, we also find the accused guilty of two violations of *former* DR 5-101(A) and one violation of DR 1-102(A)(2) and disbar him.

We find that the following facts have been established by clear and convincing evidence. The accused was admitted to practice in September 1987. Shortly thereafter, he began working for a small law firm that had an exclusive contract to provide court-appointed legal services for indigent criminal defendants and parties in juvenile proceedings in Polk County. As a result of that contract, the accused had a significant number of clients who were indigent defendants.

In 1988, the accused began a pattern, spanning at least four years, of engaging in varying degrees of sexual contact with many of his female clients. Such contacts ranged from touching his clients inappropriately and attempting to kiss them to acts of masturbation and sexual intercourse, among other things. The accused also made suggestive, sexual comments to many of his female clients, during the course of representation, and told some of them that he was interested in commencing some sort of relationship either during or after their legal matters had concluded.[2] He further insinuated to some clients that they could exchange sex for legal services. Several of the clients later reported that they felt compelled to engage in sexual contact with the accused, fearing that refusal might jeopardize the defense of their legal matters. One nonindigent client also feared that, if she did not engage in a sexual relationship with the accused after

---

[1] The relevant versions of DR 5-101(A) are discussed below. *See* 325 Or at 170-71 & n 6.

[2] We discuss the nature and extent of the lawyer-client relationship between the accused and his clients in greater detail later in this opinion.

the conclusion of her legal matters, the accused would send her bill to a collection agency. With a few exceptions, the legal matters of all the clients at issue here involved criminal charges, probation violations, child dependency proceedings, or proceedings to terminate parental rights.

In October 1993, the accused was indicted on one count of first-degree sexual abuse, a Class C felony, and two counts of second-degree sexual abuse, a Class A misdemeanor, arising from the accused's contact in 1990 and 1991 with two different clients.[3] The accused eventually pleaded no contest to one count of prostitution,[4] a Class A misdemeanor, involving one of the clients, and received a sentence of two years' probation. The court also ordered the accused to pay restitution to the other client and to complete a sex-offender evaluation.

During 1992 and 1993, the accused also was involved in a sexual relationship with a deputy district attorney who worked for Polk County. During that time, the accused represented many clients in criminal proceedings who were being prosecuted by the Polk County District Attorney's Office, as well as clients who were parties to juvenile proceedings in Polk County. In one case, the deputy district attorney was the opposing counsel. The accused did not disclose his relationship with her to any of his clients.

---

[3] The accused was indicted under the 1989 sexual abuse statutes, which were amended by the 1991 legislature. ORS 163.425(1) (1989) provided, in part:

"A person commits the crime of sexual abuse in the first degree when that person:

"* * * * *

"(b) Subjects another person to * * * deviate sexual intercourse * * *, and the victim does not consent thereto."

ORS 163.415(1) (1989) provided, in part:

"A person commits the crime of sexual abuse in the second degree if the person subjects another person to sexual contact; and

"(a) The victim does not consent to the sexual contact[.]"

[4] ORS 167.007(1) (1989) provided, in part:

"A person commits the crime of prostitution if:

"* * * * *

"(b) The person pays or offers or agrees to pay a fee to engage in sexual conduct or sexual contact."

The Oregon State Bar (Bar) filed a complaint in March 1995, and an amended complaint in December 1995, containing two causes of complaint that charged the accused with three violations of the Code of Professional Responsibility. The first cause of complaint generally summarized the nature of the accused's sexual contact with his clients and discussed his no contest plea to the charge of prostitution. Based upon that conduct, the first cause of complaint charged the accused with violating *former* DR 5-101(A) and DR 1-102-(A)(2).[5] The second cause of complaint discussed the accused's relationship with the Polk County deputy district attorney and charged the accused with a second violation of *former* DR 5-101(A). The accused filed an answer that admitted some of the factual allegations contained in the Bar's complaint, but denied violating any disciplinary rule.

A trial panel of the Disciplinary Board held a hearing in May 1996. The Bar presented evidence demonstrating, among other things, that the accused had engaged in some sort of sexual contact with 15 of his present or former clients over a four-year period. The accused admitted to some of that conduct but continued to assert that, with the exception of conduct involving one client, his conduct did not violate any disciplinary rule. The trial panel found the accused guilty of both causes of complaint, involving a total of three violations of the disciplinary rules, and disbarred him.

Because the trial panel's sanction was disbarment, this court automatically reviews that decision. ORS 9.536(2); Rule of Procedure (BR) 10.1. The accused has neither appeared nor filed a brief in this court. We therefore allowed the Bar's request to submit this matter on the record. ORAP 11.25(3). This court reviews lawyer disciplinary proceedings *de novo*. ORS 9.536(3); BR 10.6. The Bar has the burden of establishing violations by clear and convincing evidence. BR 5.2.

We begin by discussing the violation of *former* DR 5-101(A) alleged in the first cause of complaint. *Former* DR 5-101(A) (1990) provided, in part:

---

[5] The respective disciplinary rules are set out in the text that follows.

"Except with the consent of the lawyer's client after full disclosure, a lawyer shall not *accept* employment if the exercise of the lawyer's professional judgment on behalf of the lawyer's client will be or reasonably may be affected by the lawyer's own * * * personal interests." (Emphasis added.)

That rule was amended, effective January 2, 1991, and, at the time when the Bar filed its complaint, provided, in part:

"Except with the consent of the lawyer's client after full disclosure, a lawyer shall not *accept or continue* employment if the exercise of the lawyer's professional judgment on behalf of the lawyer's client will be or reasonably may be affected by the lawyer's own * * * personal interests." *Former* DR 5-101(A) (1995) (emphasis added).[6]

Because the accused's conduct took place over a four-year period beginning in 1988, both the above-quoted versions of DR 5-101(A) are applicable to the first cause of complaint. We note, however, that this court has interpreted earlier versions of DR 5-101(A), such as *former* DR 5-101(A) (1990), to include continued as well as initial acceptance of employment. *See In re Moore*, 299 Or 496, 507, 703 P2d 961 (1985) (so holding). Consequently, we conduct our analysis under the wording of the 1995 version of the rule.

The threshold inquiry under *former* DR 5-101(A) is whether a lawyer-client relationship existed between the accused and the women with whom he had sexual contact. As noted, the Bar presented evidence concerning 15 women whom the accused had represented at one time or another. At the outset, we find that the Bar has proved by clear and convincing evidence that the accused engaged in some sort of inappropriate sexual contact with nine of those women (Group 1), at a time when the accused was representing them as clients. Consequently, as to the women in Group 1, we conclude that the conduct at issue occurred during the course of a lawyer-client relationship. We also find, however, that the Bar has not met its burden concerning five of the women

---

[6] *Former* DR 5-101(A) (1995) was renumbered, effective January 29, 1997, and now is numbered as DR 5-101(A)(1). The relevant wording of the rule has not changed. Unless otherwise noted, we refer to *former* DR 5-101(A) (1995) throughout this opinion.

(Group 2).[7] Regarding the remaining woman (Group 3), it is necessary to discuss the existence and nature of the lawyer-client relationship in greater detail.

■ The accused represented the woman in Group 3 on two criminal matters and a probation violation in 1988 and 1989. In 1991, that woman contacted the accused about a potential personal injury action. The accused suggested that they go to lunch to discuss her case. After meeting at his office, the accused drove the woman to a public park and asked her to masturbate him. She did so. She then asked the accused about the merits of her case. He stated that it would be a difficult case to prove and also discussed his fee. The woman later retained the accused to represent her in that matter.

The accused does not dispute that the above-described event occurred. He argues, however, that it did not occur during a lawyer-client relationship. The accused argues, instead, that the encounter occurred before he began representing the woman in Group 3. For the reasons that follow, we reject that argument.

■ The existence of a lawyer-client relationship does not depend upon a formalized agreement. Rather, "[t]he inception of the relationship is often implied from the circumstances." *In re Bristow*, 301 Or 194, 201, 721 P2d 437 (1986); *see also In re O'Byrne*, 298 Or 535, 544, 694 P2d 955 (1985) (a lawyer-client relationship can be inferred from the conduct of the parties). Further, "[a] lawyer need not be on retainer or engaged for a specific purpose to be considered an attorney for a client who, from time to time, calls that lawyer seeking legal advice and receives such advice as a matter of course." *In re Bristow*, 301 Or at 202 (internal quotation marks omitted).

■ In *In re Weidner*, 310 Or 757, 768, 801 P2d 828 (1990), this court noted that two types of evidence may allow an inference that a lawyer-client relationship exists: "(1) the

---

[7] The evidence concerning four of the women in Group 2 demonstrated only that the accused had engaged in some sort of sexual contact with them *after* concluding his legal representation. Regarding the fifth woman, the record does not clearly demonstrate whether the accused's sexual contact with her occurred during representation.

services performed were of the kind traditionally done professionally by lawyers, *i.e.*, legal work, and (2) the putative client intended that the relationship be created." Regarding the latter type of evidence, the court further explained:

> "[T]o establish that the lawyer-client relationship exists based on [a client's] reasonable expectation, a putative client's subjective, uncommunicated intention or expectation must be accompanied by evidence of objective facts on which a reasonable person would rely as supporting existence of that intent; by evidence placing the lawyer on notice that the putative client had that intent; * * * or by evidence that the lawyer acted in a way that would induce a reasonable person in the client's position to rely on the lawyer's professional advice. The evidence must show that the lawyer understood or should have understood that the relationship existed, or acted as though the lawyer was providing professional assistance or advice on behalf of the putative client * * *." *Id.* at 770.

In addition, if a lawyer-client relationship existed between the parties in the past, that fact may support the conclusion that such a relationship was intended during a subsequent contact. *See ibid.* (noting the lack of that factor in that case).

We conclude that the accused was in a lawyer-client relationship at the time of the encounter with the woman in Group 3. That woman testified that she met with the accused because he was a lawyer and that she thought of him as her lawyer during their meeting. Additionally, their meeting was scheduled to discuss her personal injury case, which was discussed after the sexual encounter. In the light of those circumstances, we find that the incident occurred during the course of a lawyer-client relationship.

Having concluded that the accused was in a lawyer-client relationship with 10 women, those in Groups 1 and 3, when some inappropriate sexual contact occurred, we now proceed to discuss the nature of those contacts and to determine whether they demonstrate that the accused had a "personal interest[ ]" that "reasonably may [have] affected" the exercise of his professional judgment in behalf of his clients under *former* DR 5-101(A).

■ As noted, the accused engaged in a range of sexual contacts with his clients, including all the clients in Groups 1 and 3. Contacts such as acts of masturbation, oral sex, and sexual intercourse clearly demonstrate that the accused had a "personal interest" posing a potential conflict of interest under *former* DR 5-101(A).[8] Other examples of the accused's conduct included kissing and attempting to kiss several of his clients, inappropriately touching his clients on their thighs, breasts, and buttocks, and asking his clients to meet him for sexual purposes. He also often made suggestive comments to his clients while representing them, to determine whether they were willing to engage in sexual contact either during or after representation. That conduct also demonstrates that the accused had a personal interest for the purposes of *former* DR 5-101(A). *See In re Wolf*, 312 Or 655, 661, 826 P2d 628 (1992) (a lawyer who had a "strong sexual interest" in a client had a "personal interest" under DR 5-101(A)).

■■ The record also discloses that, with the exception of one client in Group 1,[9] the accused's personal interest in his clients persisted throughout the course of representation and that the accused continued to provide legal services to his clients after he had developed an overt sexual interest in them. More importantly, several clients reported that the accused insinuated to them that the quality of his representation would suffer if they did not engage in sexual activity with him. From that evidence, we further conclude that, in respect of nine of his clients, eight of the women in Group 1 and the

---

[8] We note that DR 5-110(A), adopted effective December 31, 1992, after the dates when the accused engaged in sexual contact with his clients, now prohibits a lawyer from engaging in sexual relations with a current client, "unless a consensual sexual relationship existed between them before the lawyer/client relationship commenced." Before the adoption of that disciplinary rule, such relationships were analyzed under *former* DR 5-101(A) and DR 7-101(A)(3), which prohibits a lawyer from prejudicing or damaging the lawyer's client during the course of the professional relationship. *See* OSB Legal Ethics Op No 1991-99 (conducting a *former* DR 5-101(A) and DR 7-101(A)(3) analysis).

[9] With regard to that client, the Bar presented evidence of only an isolated encounter between that client and the accused, and the record does not demonstrate whether the accused provided any additional legal assistance to that client after the encounter. Consequently, we cannot conclude that a potential conflict of interest existed under *former* DR 5-101(A).

woman in Group 3, the accused's personal interest reasonably may have affected the exercise of his professional judgment in his clients' behalf.

■ We now turn to the disclosure requirement of *former* DR 5-101(A). *See In re Alstatt*, 321 Or 324, 331, 897 P2d 1164 (1995), *cert dism* ____ US ____ , 116 S Ct 1372, 134 L Ed 2d 536 (1996) ("If a conflict of interest develops during the course of representation, DR 5-101(A) precludes a lawyer from continuing professional employment, except with the consent of the lawyer's client after full disclosure."). Full disclosure requires an explanation sufficient to apprise the client of the potential adverse impact upon that client of the matter to which he or she is asked to consent, DR 10-101-(B)(1), and further requires a recommendation that the client seek legal advice to determine whether consent should be given. DR 10-101(B)(2).[10]

The accused never complied with the disclosure requirements of *former* DR 5-101(A) or DR 10-101(B). Further, the accused implied to some clients that the quality of his representation depended upon whether they engaged in sexual contact with him. The accused's insensitivity to this issue is reflected in his testimony before the trial panel, where he stated that he did not think at the time of any of the sexual contacts with his clients that a conflict of interest existed, necessitating disclosure.

In summary, with regard to nine of his clients, eight of the women in Group 1 and the woman in Group 3, we find that the Bar has proved by clear and convincing evidence that the accused violated *former* DR 5-101(A). Consequently, we find the accused guilty of that part of the first cause of complaint. We do not so find, however, as to one of the women in Group 1 and the women in Group 2.

■ We now turn to the alleged violation of DR 1-102-(A)(2), which provides:

"It is professional misconduct for a lawyer to:

---

[10] DR 10-101(B) has been amended three times since its adoption in 1988. However, the substance of the rule, as applicable to this case, has not changed since that time.

176

"* * * * *

"(2) Commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness to practice law[.]"

The rule does not require a criminal conviction; rather, it requires only that the lawyer *commit* a criminal act that reflects adversely upon the lawyer's honesty, trustworthiness, or fitness to practice. *See In re Morin*, 319 Or 547, 559, 878 P2d 393 (1994) (so stating).

We find that the Bar has proved by clear and convincing evidence that, on different occasions, the accused violated three criminal statutes. First, in 1990, the accused committed the crime of second-degree sexual abuse when he touched a client's breast without her consent. *See* 325 Or at 169 n 3 (setting forth the 1989 version of that statute). That contact occurred while the client was in the accused's office obtaining advice on a child custody issue. Second, in 1992, the accused committed the crime of third-degree sexual abuse, when he held the hand of a client on top of his crotch, without her consent.[11] At that time, the accused was defending that client in a foreclosure action. Finally, the accused also pleaded no contest to prostitution, involving another client, for conduct that occurred in 1991. *See* 325 Or at 169 n 4 (setting forth the applicable statute). Before that incident, the accused had represented that client in a child dependency proceeding. He also represented her afterward in a termination of parental rights proceeding.[12] The accused's plea of no contest resulted in a judgment that served as a conviction on that criminal charge. *See* ORS 135.345 (providing that "[a] judgment following entry of a no contest plea is a conviction of the offense to which the plea is entered").

---

[11] ORS 163.415(1) (1991) provided, in part:

"A person commits the crime of sexual abuse in the third degree if the person subjects another person to sexual contact; and

"(a) The victim does not consent to the sexual contact[.]"

[12] The Bar also presented evidence that the accused had engaged in other sexual contact with that client during the course of the lawyer-client relationship, giving rise to a conflict of interest under *former* DR 5-101(A).

We note that not every criminal act gives rise to a violation of DR 1-102(A)(2). In *In re White*, 311 Or 573, 589, 815 P2d 1257 (1991), this court explained:

> "Each case must be decided on its own facts. There must be some rational connection other than the criminality of the act between the conduct and the actor's fitness to practice law. Pertinent considerations include the lawyer's mental state; the extent to which the act demonstrates disrespect for the law or law enforcement; the presence or absence of a victim; the extent of actual or potential injury to a victim; and the presence or absence of a pattern of criminal conduct."

We find that the accused acted intentionally and for his own personal gratification when he committed the criminal acts at issue here. The accused's criminal conduct also involved victims who were his clients either at the time of the conduct or thereafter. Moreover, the victims were vulnerable because of their involvement in emotional legal proceedings and, in the case of two victims, their indigency. Although the accused may not have caused tangible harm to his victims, his conduct intimidated and victimized them. As one victim testified, the accused's conduct left her feeling "[v]ery cheap" and "violated." She also felt "forced to * * * partake in something [she] didn't want to but * * * had to." Finally, we note that the accused's criminal conduct continued over several years.

After considering the relevant factors, we conclude that the accused violated DR 1-102(A)(2). Accordingly, we find the accused guilty of that part of the first cause of complaint.

The second cause of complaint charges the accused with a separate violation of *former* DR 5-101(A), arising from his sexual relationship with a Polk County deputy district attorney at a time when he also represented clients who were being prosecuted by the Polk County District Attorney's Office. The record discloses that that deputy district attorney represented the District Attorney's Office in the prosecution of one of the accused's clients on several criminal charges, during the time when the accused and that deputy district attorney were involved in a sexual relationship. During the

trial on that matter, the accused failed to raise objections that a defense counsel reasonably should have been expected to raise in behalf of a client.[13] From those facts, we conclude that the accused's relationship with the deputy district attorney "reasonably may [have] affected" the exercise of his professional judgment in behalf of his client. *Former* DR 5-101(A). Because the accused also did not satisfy the disclosure requirements of that rule, we find him guilty of the second cause of complaint.

We now must determine the appropriate sanction. In doing so, we are guided by the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (ABA Standards) and Oregon case law. *In re Leonhardt*, 324 Or 498, 509, 430 P2d 844 (1997). The ABA Standards require consideration of the following factors: (1) the ethical duty violated; (2) the lawyer's mental state; (3) the potential or actual injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors. ABA Standard 3.0.

The ABA Standards assume that the most important ethical duties are those that a lawyer owes to clients. ABA Standards at 5. By failing to avoid conflicts of interest, the accused violated his duty of loyalty to his clients. ABA Standards at 5. His conduct also violated the principles of trust and confidence that should exist in every lawyer-client relationship. *See In re Drake*, 292 Or 704, 713, 642 P2d 296 (1982) ("The client's trust and confidence in the lawyer is, in many cases, an indispensable ingredient in the relationship.").

We also find that, by engaging in criminal conduct, the accused violated his duty to the legal system. *See In re Wolf*, 312 Or at 662 (reaching that conclusion in a similar context). Additionally, he violated his duty to the public because his conduct undermined the public's confidence in the legal profession "to fulfill professional obligations properly toward vulnerable persons," *ibid.*, such as indigent clients.

---

[13] In a post-trial letter opinion to counsel, the trial judge specifically noted that, had the accused raised those objections, "there might not have been a trial" on three of the five criminal charges filed against the accused's client.

The ABA Standards define "intent" as "the conscious objective or purpose to accomplish a particular result" and "knowledge" as "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." ABA Standards at 17. We find that the accused acted intentionally when he engaged in the conduct discussed in this opinion. We further find that the accused knew that many of the sexual contacts were unwanted. One client reported that, after being kissed by the accused in his office, she told him that he was making her sick. However, he persisted in making advances toward her. Another client told the accused that his conduct placed her in a compromising position and that engaging in sexual activity with him made her feel like a prostitute.

The accused's conduct potentially could have harmed his clients' legal matters. First, his sexual interest in his clients could have affected the quality of his representation. More significantly, several clients reported that the accused insinuated to them that, in order to receive a "good defense," they should engage in sexual activity with him. Indeed, one client who resisted the accused's advances reported that a trial judge commented that she was poorly represented by the accused. Another client stated that she engaged in sexual activity with the accused because she "felt under duress" and feared that he would "roll over on [her]" and "throw the case" if she did not do so.

In addition to the potential impact upon his clients' legal matters, the accused's conduct caused emotional injury to his clients. The record demonstrates that the clients experienced a range of adverse emotions, from intimidation and fear to anger and confusion. Many clients also reported that they were unaware that they could obtain another lawyer, thinking that, if the accused did not represent them, they would be without legal assistance.

We also note that, after being represented by the accused, one client refused to have a court-appointed lawyer assigned to her on a subsequent charge because she feared that the court would appoint the accused again. The court eventually appointed a different lawyer. Another client also

requested and received a new lawyer after the accused made sexual advances toward her. Besides the effect upon the clients, those reassignments harmed the legal system because they required staff time to be expended as a result of the accused's misconduct. The legal system also was harmed because of the time and expense required to prosecute the accused's criminal conduct. *See In re Hawkins*, 305 Or 319, 326, 751 P2d 780 (1988) (litigation resulting from the accused's misconduct harmed the legal system by resulting in expense to the system and to taxpayers).

We find the existence of several aggravating factors. First, the accused acted with a selfish motive when he placed his need for sexual gratification above the needs of his clients. ABA Standard 9.22(b); *see In re Wolf*, 312 Or at 662 (applying that factor in a similar context). Second, the accused engaged in a pattern of misconduct and committed multiple offenses. ABA Standards 9.22(c) and (d).

Third, the accused also refuses to acknowledge the wrongful nature of his conduct. ABA Standard 9.22(g). With few exceptions, the accused continues to hold the view that he did not violate any disciplinary rule when he engaged in sexual contact with his clients. He acknowledges that he often "groomed" clients during representation, to see where it would lead, and then pursued relationships with them after the representation had ended. He also testified that, if he could do things differently, he "would have viewed a case as a case and not * * * as an opportunity to * * * potentially have extracurricular activity after the representation." However, the accused has not acknowledged that such a sexual interest in a client could violate a disciplinary rule. He also has not acknowledged the harm caused to his clients.

Finally, the accused's conduct involved vulnerable victims. ABA Standard 9.22(h). Most of the clients discussed in this opinion were indigent defendants in criminal cases or parties to juvenile court proceedings. The accused himself has acknowledged that his clients were both "socially needy" and "emotionally needy." Moreover, the child dependency petition filed against one client and the petition for termination of parental rights filed against another client alleged

that those clients were mentally ill. In short, the accused's clients were vulnerable, and the accused was aware of that fact.

The only mitigating circumstances are the lack of a prior disciplinary record and an earlier imposition of penalties or sanctions, in the form of a criminal conviction, probation, and the payment of restitution to one client. ABA Standards 9.32(a) and (k). We note that, at the time when many of the sexual contacts occurred, the accused was inexperienced in the practice of law. ABA Standards 9.32(f). We do not find that mitigating factor to be applicable here, however, because the accused's misconduct does not relate to his *ability* to practice but, rather, reflects upon his *judgment and fitness* to practice.

ABA Standard 4.31 provides, in part:

"Disbarment is generally appropriate when a lawyer, without the informed consent of client(s):

"(a) engages in representation of a client knowing that the lawyer's interests are adverse to the client's with the intent to benefit the lawyer * * *, and causes serious or potentially serious injury to the client[.]"

The commentary states that disbarment generally is imposed when a lawyer "intentionally exploit[s] the lawyer-client relationship" in a financial or pecuniary sense for the lawyer's own benefit. ABA Standards at 29. In our view, although this case involves a personal and not a financial interest, that same principle applies here. The accused repeatedly exploited his clients for his own personal interests. He insinuated that they were required to participate in sexual contact with him in order to receive proper representation. The clients felt compelled to engage in sexual activity with the accused, for fear that refusal would affect their legal matters adversely or leave them without legal assistance. The accused abused his power over his clients and destroyed the trust that all clients should have in their lawyers.

"The purpose of a sanction is not to penalize the accused, but to protect the public and the integrity of the profession." *In re Carey*, 307 Or 315, 321, 767 P2d 438 (1989) (brackets and internal quotation marks omitted). In order to

provide that protection in this case, we conclude that we must disbar the accused from the practice of law.

The accused is disbarred.